1

2

3

4

5

6

7

8

9

10

11                    **UNITED STATES DISTRICT COURT**

12                         **DISTRICT OF NEVADA**

13

14  WESTERN WATERSHEDS PROJECT and   )        3:11-cv-00053-HDM-VPC
    CENTER FOR BIOLOGICAL DIVERSITY, )
15                                   )
             Plaintiffs,             )
16                                   )        ORDER
    vs.                              )
17                                   )
    BUREAU OF LAND MANAGEMENT,       )
18                                   )
             Defendant, and          )
19                                   )
    SPRING VALLEY WIND LLC,          )
20                                   )
             Defendant-Intervenor.   )
21  _____)

22
         This case concerns approval of a wind energy facility in
23
    Spring Valley, Nevada.   Plaintiffs are two environmental
24
    organizations – Western Watersheds Project and Center for
25
    Biological Diversity.[1]  Defendant is the Bureau of Land Management
26

27  _____

28       [1] Originally, there were five plaintiffs, including three Native
    American tribes – the Confederated Tribes of the Goshute Reservation,

(BLM).   Intervening defendant is Spring Valley Wind, LLC, the energy company developing the wind facility at issue.

Plaintiffs filed a motion for a temporary restraining order and/or preliminary injunction pursuant to Federal Rule of Civil Procedure 65 seeking to bar the BLM from issuing a Notice to Proceed or otherwise authorizing construction and site clearing for the Spring Valley Wind Energy Facility set to commence on March 28, 2011.

## I.   Factual Background[2]

The Spring Valley Wind Energy Facility project is an industrial scale alternative energy project to be constructed in and around Spring Valley in east-central Nevada near Great Basin National Park.  Approximately 430 acres is the total area estimated for use for the project (including short-term and long-term disturbance).  This is approximately 5.6 percent of the total right

Duckwater Shoshone Tribe and Ely Shoshone Tribe.  On March 17, 2011, the Tribes filed a voluntary dismissal with prejudice of all their claims.  The only remaining cause of action is the environmental plaintiffs' National Environmental Protection Act (NEPA) claim.  The court does not address the cultural impacts of the project in deciding the motion for a preliminary injunction.

[2] The facts in this section are taken from the final environmental assessment (hereinafter cited to as EA) and other documents in the Decision Record (hereinafter cited to as PAR).  Specific cites accompany facts noted in the analysis section of this memo.

of way.  The project would advance United States' goal of providing renewable energy generation options to Nevada.  It would generate enough energy to power 45,000 Nevada homes, up to $3 million in tax benefits to local school districts, and provide 225 jobs during the construction phase.  The overall expected economic benefit for Nevada from the project is $45 million.  Approval of the project makes it eligible for millions of dollars of federal financing under the American Recovery and Reinvestment Act, which requires that qualifying projects commence construction no later than September 30, 2011.

The project area is not untouched.  The existing landscape has been modified through past and current human habitation, road development, ranching and mining activities, and transmission lines.  Project construction would incorporate existing structures and include over 25 miles of new roads, between 66 and 75 lighted 400-foot tall wind turbines, two gravel pits, over nine miles of new fencing, a microwave tower, electrical lines, switchyard, and other facilities.

Project site clearing and construction is scheduled to begin the week of March 28, 2011. Erection of the wind turbines is scheduled for March 2012.  The Spring Valley Wind Facility is expected to be commercially operational by June 2012.

Site clearing and construction for the project is set to begin March 28, 2011.  This would impact native vegetation and wildlife, including the greater sage-grouse.  There are 38 sage-grouse leks (mating grounds) in Spring Valley, three within a mile of the project site, but none in the project area.  The project site

3

itself is in low quality sagebrush habitat, the highest-quality habitat is located outside the project area, and the area already contains existing roads and transmission lines.  In addition, to offset potential impacts, Spring Valley Wind committed $500,000 (eligible for federally matched funding) to enhancing sagebrush habitat in the area.

The operation of the turbines beginning in 2012 would also impact local bat populations.  The public land designated for the project is near a large seasonal bat cave in the Great Basin, the Rose Guano Cave. The Rose Guano Cave is located four miles from the Spring Valley Wind project site and is a seasonal roost site to over one million Brazilian free-tailed bats[3] during their fall migration in August and September.  The bats' migratory path takes them near the Spring Valley Wind Project site.  The bats also travel up to 50 miles one-way at night to forage for insects, and may consume their body weight nightly.

Bats are vulnerable to mortality from operational wind turbines because wind turbines attract insects that the bats feed on and are perceived by the bats as potential migratory rest-stops or roosting sites.  Bats are killed by contact with moving turbine blades and by "barotrauma."  Barotauma is a phenomenon that occurs when air pressure changes near spinning turbine blades.  The change in air pressure causes the bats lungs to suddenly expand, bursting blood vessels.  Ninety percent of bat fatalities near wind turbines may be attributed to barotrauma.

---

[3] The Brazilian free-tailed bat (*Tadarida brasiliensis*) is one of the most abundant bat populations in the United States.

4

## II.   Procedural Background

In June 2009, the federal government announced plans for the BLM to "fast track" the approval process for renewable energy projects across the United States.  "The fast track process is about focusing [BLM] staff and resources on the most promising renewable energy projects." (BLM Opp'n Ex. A) The Spring Valley Wind Facility was approved for a "fast track."

In December 2009 and July 2010, the BLM issued preliminary environmental assessments (EAs) for the project.  The preliminary EAs concluded that the project would pose no significant environmental impacts.

In response to these documents, the BLM received over 67 public comment letters, containing almost 1,000 comments. Plaintiffs were among those who submitted written comments and met with the BLM over their concerns with the preliminary EAs.  Several agencies and organizations, including the U.S. Fish and Wildlife Service, Nevada Department of Wildlife, National Parks Service, and Southern Nevada Water Authority, were also initially concerned about the preliminary EAs.

On October 15, 2010, the BLM approved the project through a Decision Record and Finding of No Significant Impact (FONSI) and issued a Final Environmental Assessment which addressed comments and concerns.  As a result, it did not complete an environmental impact statement (EIS).

The final EA tiers to the BLM's 2005 Final Programmatic EIS on Wind Energy Development on BLM Administered Lands in the Western United States (Wind PEIS), a document that evaluates the

consequences of wind energy development across BLM lands, and the 2007 Ely Resource Management Plan's Final EIS.  The final EA also relies on a detailed Avian and Bat Protection Plan (ABPP) to mitigate project impacts on bats and birds.  The ABPP mitigation measures include: (1) creation and utilization of a Technical Advisory Committee (TAC) to monitor bat and bird mortality and ensure the implementation of mitigation measures should the mortality rates reach BLM designated thresholds; (2) a radar detection system to monitor flight and migratory habits and potentially trigger turbine breaks and feathering during periods of high flight activity; (3) wind turbine operation curtailment and shut downs; and (4) a mitigation fund.  The mitigation measures do not include the recommendation of orienting wind turbines parallel to bat and bird flight patterns because doing so would render the turbines useless based on area wind flow.

On October 22, 2010, the BLM issued two rights-of-way to Spring Valley Wind, LLC.  One was for the wind generation facility and substation, and the other was for a switchyard, overhead electrical lines, fiber-optic cable, microwave tower, and associated facilities.

On November 13, 2010, the environmental plaintiffs filed an administrative appeal and petition for stay to the Interior Board of Land Appeals (IBLA).  On January 11, 2011, those plaintiffs filed a notice of dismissal of their appeal.[4]

_____

[4] On November 15, 2010, the now dismissed Tribal plaintiffs filed their own administrative appeal to IBLA.  The Tribes dismissed their appeal on January 20, 2011.  If the IBLA fails to rule on a petition

6

1    On January 25, 2011, plaintiffs filed a complaint with this
2 court alleging the BLM violated the National Environmental Policy
3 Act (NEPA), 42 U.S.C. § 4321 *et seq*.  On February 28, 2011,
4 plaintiffs filed a motion for temporary restraining order and/or
5 preliminary injunction, seeking to enjoin site clearing and
6 construction of the project.  Defendants BLM and Spring Valley
7 Wind, LLC opposed the motion on March 15, 2011 in separate
8 responses.

9

10 **III. Legal Standard for a Preliminary Injunction[5]**

11    *Winter v. Natural Resources Defense Council Inc.* set forth a
12 four-factor test the court must apply before issuing injunctive
13 relief.  129 S. Ct. 365, 374 (2008).  Plaintiffs seeking injunctive
14 relief must establish: (1) a likelihood of success on the merits,
15 (2) a likelihood plaintiffs will suffer irreparable harm in the
16 absence of preliminary relief, (3) the balance of equities sharply
17 favors the plaintiffs, and (4) an injunction is in the public
18 interest. *Id.*

19    The court may also use a "sliding scale" approach.  If there
20 exist "'serious questions going to the merits ... and the balance
21 of hardships tips sharply in the plaintiff's favor,'" then the
22 court may issue an injunction, assuming the other *Winter* factors

23 ──────────────────────
24 for stay within 45 days, the stay is deemed denied and the decision
     made effective.
25
26    [5] The standard for a preliminary injunction and a temporary
27 restraining order are the same.  *See Lockheed Missile & Space Co. v.
     Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995).
28

7

1 | are met.  *Alliance for Wild Rockies v. Cottrell*, 2011 WL 208360, at
2 | *7 (9th Cir. Jan. 25, 2011)(internal citations omitted).

3 |     An injunction is not a remedy that issues automatically in an
4 | environmental case. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311
5 | (1982).  There is no presumption that environmental harm should
6 | outweigh other harms to the public interest.  *Winter,* 129 S. Ct. at
7 | 382.  Plaintiffs have a heavy burden in establishing the need for
8 | an injunction. *Id.* at 374.  The court, when it issues an
9 | injunction, must craft it as narrowly as possible.  *Monsanto Co. v.*
10 | *Geertson Seed Farms*, 130 S. Ct. 2743, 2758 (2010).

11 |
12 | **IV.  Analysis**

13 |     A.  Likelihood of Success on the Merits

14 |     Plaintiffs claim the BLM conducted a "fast track" approval of
15 | the Spring Valley Wind Facility so that the project could take
16 | advantage of federal financing under the American Recovery and
17 | Reinvestment Act, which required project approval by the end of
18 | 2010.  It is alleged this approval process was pushed by high-level
19 | BLM officials and Spring Valley Wind, LLC proponents in violation
20 | of NEPA.  Specifically, plaintiffs claim: (1) there are significant
21 | and unknown environmental impacts to the project site that warrant
22 | an EIS, not just an EA; (2) the BLM's decision provided no detailed
23 | statement of reasons establishing that the project's impacts are
24 | insignificant; (3) the BLM failed to take a "hard look" at the
25 | environmental impacts without adequate scientific data, including
26 | impacts to bats and sage-grouse, and the cumulative environmental
27 | impacts of the project; (4) the decision did not properly consider
28 |

or address public comments and opposing views; and (5) the final EA failed to consider an adequate range of alternative courses of action.

### 1.   APA and Review of the BLM's Decision

The Administrative Procedures Act, 5 U.S.C. § 706, governs the court's review of agency action under NEPA.  The court must determine if the agency action in question was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A),(D) (2006).  This standard requires the court to ensure that the agency has taken the requisite "hard look" at the environmental consequences of its proposed action, the agency's decision is based on a reasoned evaluation of all the relevant factors, and the agency has sufficiently explained why the project's impacts are insignificant.  *National Parks & Conservation Assoc. v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001).

This is a highly deferential standard and the court must defer to an agency's decision that is "fully informed and well-considered." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998)(internal citation omitted).  The court must be careful not to substitute its own judgment for that of agency experts. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1993); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989).

An agency decision is arbitrary and capricious where it "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered

an explanation that runs counter to the evidence before the agency [at the time of its decision] or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)(*en banc*)(quotations omitted).  Plaintiffs have the burden of showing that any decision or action by the agency was arbitrary and capricious. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

> 2.  *NEPA Requirements for an Environmental Impact Statement*

NEPA requires federal agencies, like the BLM, to prepare an environmental impact statement EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)© (2006).  This is to ensure that the agency "will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

The requirement to prepare an EIS is triggered when a proposed project will "significantly affect" the environment.  42 U.S.C. § 4332(2)(C).  An agency may prepare an EA "to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS... An EA is a 'concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact' (FONSI)." *Blue Mountains Biodiversity Project*, 161 F.3d at 1212 (quoting 40 C.F.R. § 1508.9).  EAs may "tier" to

10

other NEPA documents, but tiering does not eliminate the EIS requirement when a proposed project significantly affects the environment.  40 C.F.R. §§ 1502.20, 1508.28.  If an agency decides not to prepare an EIS, it must provide a detailed statement of reasons explaining why the proposed project's impacts are insignificant. *Blue Mountains Biodiversity Project*, 161 F.3d at 1212.

"An EIS must be prepared if 'substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor.'" *Id.* (internal citations omitted).  Plaintiffs need not show that significant effects *will* occur, it is enough to raise "substantial questions" whether a project *may* have a significant effect on the environment.  *Id.*  To determine if a project may have "significant" impacts, an agency must evaluate ten NEPA factors. 40 C.F.R. § 1508.27(b).  The factors at issue in this case are: effects that are "highly uncertain or involve unique or unknown risks" or are "likely to be highly controversial"; "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, [] wetlands, [] or ecologically critical areas"; "[t]he degree to which the action ... may cause loss or destruction of significant scientific, cultural, or historic resources"; and the presence of cumulative impacts. *See* 40 C.F.R. §§ 1508.27(b)(3)-(5), (7)-(8).  Just "one of these factors may be sufficient to require preparation of an EIS." *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 865 (9th Cir. 2005).

An agency's decision to forego issuing an EIS may be justified

11

by the adoption of mitigation measures to offset potential environmental impacts. *Babbitt*, 241 F.3d at 733-34 (*citing Wetlands Action Network v. United States Army Corps of Eng'rs*, 22 F.3d 1105, 1121 (9th Cir. 2000); *Friends of Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993).).  Further, if "significant measures are taken to 'mitigate the project's effects, they need not completely compensate for adverse environmental impacts.'" *Wetlands Action Network*, 222 F.3d at 1121 (quoting *Friends of Payette*, 988 F.2d at 993.).  The proposed mitigation measures must be "developed to a reasonable degree." *Id.* Mitigation measures with supporting analytical data are sufficient to support a finding of no significant impact. *See Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1151 (9th Cir. 1998).  "In evaluating the sufficiency of mitigation measures, [the court] consider[s] whether they constitute an adequate buffer against the negative impacts that may result from the authorized activity[, s]pecifically, ... examin[ing] whether the mitigation measures will render such impacts so minor as to not warrant an EIS." *Babbitt*, 241 F.3d at 734 (*citing Greenpeace Action*, 14 F.3d at 1332.).

(a)   Sage-Grouse Impacts

Sage-grouse may be threatened by range fragmentation and habitat destruction.  Here, existing roads and facilities already fragment area sage-grouse habitats. (EA 58)  The project area is not one with high-quality sagebrush, suitable for sage-grouse habitats. (EA 58, 165)  Of the 38 sage-grouse leks in Spring Valley, there are none in the project area. (EA 59)  The closest lek is 1.5 miles from the site, is separated from the project by

12

State Highway 893, and averages only three birds per year. *Id.*   Two
other leks about 6000 feet from the project's boundaries are
inactive and are divided by U.S. Highway 50/6, State Highway 893
and other dirt roads.   *Id.*   Telemetry data collected between 2008
and 2010 by the Southern Nevada Water Authority recorded no birds
in the project area.   *Id.*   The EA determined that construction
would temporarily disturb some sage-grouse habitat, but that the
area disturbed encompassed only four percent of the total habitat.
Permanent disturbance would be even more minimal at one percent of
the total habitat. (EA 105-106)

     The BLM will implement mitigation measures to reduce the
impact on sage-grouse.   Permitted activities are restricted during
sage-grouse mating season, from March 1 to May 15, within two miles
of an active lek.   (EA 160, 164-9)   There are stringent
requirements to prevent weed infestation and protect soil resources
that will be managed by a third-party contractor under the
direction of the BLM. (SVW Opp'n Inlow Decl. ¶ 3)   Spring Valley
Wind will provide $500,000 for sagebrush enhancement and
restoration for locations with higher-quality habitat. (EA app. F,
at 18) This amount is eligible for matching federal and state
funds.   In addition, the BLM will work to reduce predation through
mitigation measures, such as the installation of anti-perching
devises on existing and new power lines. (EA 166)

     After considering the record and the mitigation measures to be
implemented by the BLM, the court concludes that the plaintiffs
have not shown that substantial questions have been raised that the
project will cause significant degradation to the sage-grouse

population and habitat.  The agency did not abuse its discretion in deciding not to prepare an EIS relative to the sage-grouse.

(b)  Bat Impacts

The Rose Guano Cave is four miles east of the project site and a seasonal migratory stop-over to approximately one million Brazilian free-tailed bats between August and September.  (EA 61) During their fall migration, the bats remain at the cave for only four days before leaving the local area.  *Id.*  While at the cave, the bats' nightly foraging pattern takes them to high altitudes around the valley and south of the project site to agricultural fields. (EA 61-62 (preliminary data showed that majority of bats reach altitudes of 1,200 feet after existing the cave and before traveling south to agricultural fields where they sometimes forage at 2,400 feet above ground level, only some "portion of [the bat] plume drop[s] to forage in valley" in which the project site is located), 109 ("bats are ... expected to fly around the individual" wind turbines))  The project area is not a roosting site for the species. (EA 62)

Because of the cave's relative proximity to the project area and because the bats may occasionally fly near the project site while foraging or migrating, the BLM undertook a comprehensive review of available scientific reports regarding the bats' vulnerability to wind turbine mortality, either through barotrauma

14

or collision, while compiling the EA.  (PAR 96[6], 109[7], 1546[8], 1222[9], 1229, 1234, 1237-1239)  The BLM also studied bat mortality rates from 11 wind energy facility studies that focused on facility and habitat sites similar to Spring Valley. (EA app. F, at 24)  Based on these studies, the BLM concluded that the bat mortality threshold for the project would be 192 bats per year, or 2.5 bats per turbine per year.[10]  *Id.*  This threshold was developed through

---

[6]Baerwald, et al. 2008. *Barotrauma is a Significant Cause of Bat Fatalities at Wind Turbines.*

[7] Arnett, et al. 2009. *Effectiveness of Changing Wind Turbine Cut-in Speed to Reduce Bat Fatalities at Wind Facilities*. (2008 Annual Report (published 4/1/2009)).

[8] Baerwald, et al. 2009.  *A Large-Scale Mitigation Experiment to Reduce Bat Fatalities at Wind Energy Facilities.*

[9] Sherwin, R.E. 2009. *A Study on the Use of Rose Guano Cave, Nevada, by Mexican Free-Tailed Bats* (Tadarida brasiliensis).

[10] The BLM considered data from a Montana Judith Gap Study which presents a bat mortality rate of 13.4 bats per turbine per year. (EA app. F, at 24)  The data from the Judith Gap Study could not be verified like that of the other ten studies in the group. *Id.*  The BLM also examined species-specific mortality threshold data. *Id.* at 29. While the species-specific mortality threshold for the Brazilian free-tailed bat is higher than the species-specific mortality threshold for other bat species, this appears to be due to the relative abundance of Brazilian free-tailed bats, which seems to be significantly higher than other species. *Id.* (The relative abundance of free-tailed bats

1  coordination between the BLM, NDOW, FWS, and other wildlife
2  professionals and experts. *Id.*

3      Based on the data presented and potential concerns raised in
4  these studies, the BLM properly developed a detailed process for
5  addressing potential impacts on bats from the project and to ensure
6  the bat mortality rate would not surpass 192 bats per year.   That
7  process is set forth in detail in the EA, particularly in the ABPP.
8  *Id.* at 14-31.  The process is divided into three sections: initial
9  mitigation, pre and post-construction monitoring, and adaptive
10 management based on monitoring results. *Id.* at 14.   Initial
11 mitigation measures include a Technical Advisory Committee (TAC) to
12 monitor Spring Valley Wind Energy Facility (SVWEF) activities,
13 "including mortality data, to determine the need for project
14 mitigation." *Id.*  Bat mortality would be monitored by the TAC
15 through daily project site surveys to ensure that mitigation
16 measures are promptly initiated once the mortality threshold is
17 met.  To ensure full functionality, the TAC will be funded in part
18 by Spring Valley Wind, LLC. *Id.* at 15.  Initial mitigation measures
19 also include radar monitoring of bird and bat flight habits and
20 patterns.  The radar system is intended to serve as a "management
21 tool to assist with selecting the most effective times for [turbine
22 speed] curtailment," but may also be used as an "early warning"
23 system, "providing advance detection of bird or bat activity ...
24 with the ability to shut down turbines." *Id.* at 16.  In addition,
25 mitigation measures include turbine speed curtailment and shut
26 downs. *Id.* at 17.  Curtailment initially will be utilized during

27 _____

28 is 11.4 compared to 0-2 or 3 for other bat species).

16

the "highest use periods of August 1 through September 31, from sunset to 4 hours after sunset." *Id.* The proposed adaptive management process governs the implementation of up to five turbine curtailment mitigation phases if the designated bat mortality threshold is met. *Id.* at 22-23.  These phases contemplate up to 1,080 hours of cut-in speed curtailment and turbine shutdowns for up to 37,500 hours. *Id.* at 25.  Other mitigation measures include "raptor proofing" facility infrastructure, nocturnal surveys, a $500,000 wildlife fund, and public outreach. *Id.* at 17-18, 28.

The EA provides persuasive scientific data that the impact on the bats, if these mitigation measures are implemented, will not be significant.  Studies of the bats at the Rose Guano Cave, located four miles east of the project site, suggest that the bat population is at the case for only two months out of the year, they remain in the cave for four days while there, and fly to 1,200 feet after leaving the cave to forage in agricultural fields south of the project site, reaching heights well above the 400 foot maximum turbine height. (EA 61)  The bats may avoid the project site altogether. (EA 109)  In addition, radar monitoring of bat flight and migratory habits in combination with turbine curtailment during times of high bat activity has been shown to reduce bat mortality by 53 to 87 percent.  (EA 98)[11]  Lastly, the predicted short-term disturbance of bat habitat and foraging area represents only 3.9 percent of the total available foraging area within the project

[11]  Arnett, et al. 2009. *Effectiveness of Changing Wind Turbine Cut-in Speed to Reduce Bat Fatalities at Wind Facilities*. (2008 Annual Report (published 4/1/2009)).

boundaries, and the long-term disturbance is only 1.3 percent of the project area.  (EA 96)

As a result of the BLM including extensive mitigation measures in the final EA, including an Avian and Bat Protection Plan (ABPP), and adopting an Alternative Development Alternative, state and federal agencies, such as the Nevada Department of Wildlife (NDOW) and the U.S. Fish and Wildlife Service (FWS), that had initially expressed concerns with bat attraction to turbines, potentially high bat mortality rates, and, therefore, potentially significant impacts on the environment in the preliminary EAs, supported the BLM's final EA and adoption of the FONSI. (PAR 771 (NDOW's concerns addressed in final EA), 772 (NDOW enthusiastically in support of mitigation measures), 867 (FWS believe the ABPP to be appropriate), 520 (internal BLM concerns addressed in final EA))  Indeed, the substantial mitigation measures to be implemented by the BLM throughout the life of this project removes any significant uncertainty that there are substantial questions concerning potential environmental impacts.

The agency's decision to forego issuing an EIS is justified by the adoption of significant mitigation measures to offset potential environmental impacts. *Babbitt*, 241 F.3d at 733-34.  These measures are supported by analytical data and they adequately buffer against any potential negative impacts.  They support a finding of no significant impact not warranting an EIS. *See Idaho Sporting Congress*, 137 F.3d at 1151; *Babbitt*, 241 F.3d at 734. The court therefore concludes that the BLM did not abuse its discretion or act arbitrarily of capriciously in preparing and relying on the EA.

18

1              (c) EA Properly Tiered to Other Documents

2         "Tiering, or avoiding detailed discussion by referring to

3   another document containing the required discussion, is expressly

4   permitted" and encouraged under NEPA, so long as the tiered-to

5   document has been subject to NEPA review.  40 C.F.R. §1502.02.

6   Tiered analyses are viewed as a whole to determine whether they

7   address all the impacts.  *S. Or. Citizens Against toxic Sprays,*

8   *Inc. v. Clark*, 720 F.2d 1475, 1480 (9th Cir. 1983).  A programmatic

9   environmental impact statement (PEIS) may obviate the need for a

10  site-specific impact statement. *Cf. Salmon River Concerned Citizens*

11  *v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994).  However, new and

12  significant issues that develop after an agency issues a PEIS

13  should be evaluated in an EA. *Id.*  Only where neither the general

14  nor the site-specific documents address significant issues is

15  environmental review rejected.  *Te-Moak Tribe v. U.S. Dep't of the*

16  *Interior*, 608 F.3d 592, 602-7 (9th Cir. 2010).

17        The 2005 Wind PEIS contemplated site-specific tiering when it

18  stated: "The level of environmental analysis to be required under

19  NEPA for individual wind power projects will be determined at the

20  [field office] level.  For many projects, it may be determined that

21  a tiered ... [EA] is appropriate in lieu of an EIS." (Wind PEIS A-2

22  - A-8)[12]  The Wind PEIS analyzed the potential impacts of wind

23  energy development on public lands, it specifically studied BLM

24  lands in the western United States, and examined mitigation

25  measures to reduce harmful impacts on natural, cultural, and

26  socioeconomic resources.

27  _____

28        [12] http://windeis.anl.gov/documents/fpeis/index.cfm.

Any new issues that developed after the Wind PEIS was published were addressed in detail in the final Spring Valley Wind EA.  The EA specifically supplements the Wind PEIS with site-specific data on bats and sage-grouse on pages 52-53, 58-63, 96-98, 101-102, 105-111, 151-153, 165, 167.  The EA considered barotrauma in bats, bat flight patterns and height, the Fish and Wildlife Service's decision to list sage-grouse as "warranted" for the endangered species list, and 2008-2010 telemetry data concerning active and inactive leks in the project area. (EA 97, 108-109, 58-59)

An EA need not consider all mitigation measures proposed in a PEIS.  Measures should be evaluated objectively and on a site-specific basis before being implemented. (Wind PEIS 5-1) The BLM considered the mitigation measures proposed by the Wind PEIS and implemented the ones most suited for the project site. (EA 160-173) The Wind PEIS lists hundreds of potential mitigation measures. (*See e.g.* EA 161-171)  It would not be possible to implement all the suggested measures.  Notably, when the EA did not adopt a mitigation measure, it explained why.  For example, the Wind PEIS suggests orienting turbines to bat and bird flight paths.  The BLM considered this mitigation measure and determined it was infeasible at the project site because the turbines could not take advantage of the wind flow through Spring Valley oriented in that position. (EA 164)  Tiering the EA to the Wind PEIS was proper.

(d)  "Hard Look" and Cumulative Impacts

In determining whether an action requires an EIS, the agency must consider whether the action "is related to other actions with

1    individually insignificant but cumulatively significant impacts."

2    40 C.F.R. § 1508.27(b)(7).  The EA's discussion of cumulative

3    impacts includes a detailed table that discusses past actions,

4    present actions and future actions that may cumulatively impact the

5    environment, including other impacts to the environment such as

6    ranching and grazing and notes that adjustments may need to be made

7    to maintain habitat quality of other species in the area, including

8    utilizing existing fencing and vegetation treatment. (EA 148-151)

9    It also tiers to the Wind PEIS[13] and notes that "direct, indirect

10   and cumulative impacts" are "quantified where possible" in its

11   individual "discussions of impacts on each affected source." (EA

12   148)  Impacts on bats and sage-grouse are addressed in more detail

13   in other sections of the EA, as set forth in the discussions above.

14   (EA 81-122, 96-98, 101-102, 108-110, app. F)  By tiering to the

15   Wind PEIS and incorporating new scientific data into its final

16   decision, together with articulations of substantial mitigation

17   measures, the court concludes that the BLM sufficiently considered

18   the cumulative impacts of the project and took a "hard look" as

19   required.

20                 (e)  Reasons Impacts Insignificant

21        The BLM outlined why the environmental impacts from the

22   project would be insignificant in the FONSI and the final EA.  The

23   FONSI references the Wind PEIS, Spring Valley EA and ABPP.  The EA

24   itself is a detailed statement of reasons explaining why

25   _____

26        [13] The Wind PEIS ultimately concluded that incremental effects

27   from wind energy development would be minimal.  (Wind PEIS 6-9, 6-12)

28   The EA references this conclusion. (EA 148)

environmental impacts are insignificant.

As discussed above, the EA explains in detail the nature of sage-grouse activity in Spring Valley, the lack of active leks within the project boundaries, and previous and present fragmentation of habitat. (EA 58-59)  The EA determined that construction would temporarily disturb some sage-grouse habitat, but that the area disturbed encompassed only four percent of the total habitat.  Permanent disturbance would be even more minimal at one percent of the total habitat. (EA 105-106)  Sagebrush restoration and enhancement would reduce these impacts further. (EA 25)

While there is some uncertainty as to how the project will impact the bat population that temporarily roosts at the Rose Guano Cave during migration, the EA, as tiered to the Wind PEIS, provides substantial scientific evidence that the project will not significantly affect the bat population if the mitigation measures expressed in the EA are implemented as planned.  As discussed in depth in the EA, a TAC to monitor project activities and species mortality thresholds, nocturnal surveys, radar detection systems, phased turbine curtailment and shutdowns, a wildlife fund, and predator-proofing the area, in conjunction with already known bat habits should reduce the risk to bats to insignificant levels.

For the reasons stated here and set forth above, the court concludes that the BLM has provided a detailed statement of reasons explaining why the proposed project's impacts are insignificant. *Blue Mountains Biodiversity Project*, 161 F.3d at 1212.

1                    (f)   Consideration of Alternatives

2          Plaintiffs contend that the BLM neglected to implement the

3    following mitigation measures and alternatives: (1) avoid placing

4    wind turbines near known bat colonies, migration corridors, or

5    flight paths; (2) turbine arrays should be oriented to minimize bat

6    and avian mortality; (3) avoid sitting projects in sage-grouse

7    leks; and (4) avoid creating attractions for raptors and predators.

8          The BLM adequately considered alternatives to mitigate

9    potential environmental harms. The EA is tiered to the Wind PEIS,

10   which considered over 200 possible mitigation measures. (EA 161-

11   171)   One of the mitigation measures adopted is the installation of

12   anti-perching devises on existing and new power lines to prevent

13   increased predation (predator or raptor-proofing the area). (EA

14   166)   Although the turbines will not be oriented parallel to known

15   bird and bat movements,[14] they will be situated four miles east of

16   the Rose Guano Cave and the bats usual foraging flight path takes

17   them south to agricultural fields, away from the project. (EA 61)

18   In addition, data from telemetry surveys (2008 to 2010) shows low

19   quality sagebrush habitat and no sage-grouse activity and no active

20   leks within the project's boundaries. (EA 58-59)   The final EA also

21   adopts the Alternate Development Alternative and Avian and Bat

22   Protection Plan that incorporate as many mitigation measures for

23   bats and sage-grouse as feasible given the project site's

24   characteristics.   The Alternate Development Alternative locates the

25   wind turbines in a smaller project area, with a protective two mile

26   _____

27          [14] Orienting turbines in this way would render project inoperable.
     (EA 164)

28

                                       23

1    buffer from the nearest active sage-grouse leks. (FONSI 3)   The

2    ABPP includes data from a two-year preconstruction study used to

3    determine bat impacts, sets a bat mortality threshold at 192 bats

4    per year, and suggests substantial mitigation measures, such as

5    radar monitoring of bat activity and turbine speed curtailment to

6    avoid meeting the threshold.  *Id.*  Thus, the EA specifically

7    addresses each of the alternatives plaintiffs contend the BLM

8    ignored and explains if the measure was adopted, modified, or

9    rejected and why. (EA 164 - 165)

10                    (g)   Consideration of Public Comments

11       The BLM adequately considered and addressed public comments in

12   the EA.   67 letters from the public containing almost 1,000

13   comments in response to the preliminary EAs were addressed in the

14   final EA. The bulk of the public comments are incorporated and

15   addressed in Table 6.1.1 on pages 161-173 of the EA.

16       A number of agencies that voiced concerns at the outset of the

17   review process, later concluded that the BLM had sufficiently

18   addressed their concerns.  For example, the Southern Nevada Water

19   Authority (SNWA) and the Fish and Wildlife Service (FWS) initially

20   expressed concerns about the sage-grouse in response to preliminary

21   EAs.   These concerns were resolved in the final EA. The SNWA

22   acknowledged this in a letter lauding the project's sagebrush

23   conservation plan and approving the Alternate Development

24   Alternative.   (PAR 1544)  The FWS expressed concern over the

25   proximity of leks to the project area.  BLM telemerty data tracking

26   sage-grouse movement in the project area from 2008-2010 addressed

27   this concern and concluded that there was little, if any, sage-

28

                                    24

1   grouse activity within the project boundaries. (PAR 1572; EA 59)
2   The BLM also looked to its National Sage-Grouse Habitat
3   Conservation Strategy to determine that a two mile buffer between
4   the project site and active leks was sufficient.  The Nevada
5   Department of Wildlife and FWS initially expressed concerns about
6   the projects impacts on bats. (PAR 1588-1591)  However, these
7   agencies approved of the final ABPP and EA.  In a letter, the NDOW
8   stated that concerns raised early on in the process "have been
9   addressed in this environmental assessment" and mitigation plan.
10  (PAR 771)  NDOW "enthusiastically support[ed] the use of adaptive
11  management in ... minimizing wildlife mortality... [and] the use of
12  a [TAC] to identify and solve project issues." (PAR 772)  The FWS
13  stated it believed the ABPP "to be appropriate" if the agency's
14  "substantive comments are incorporated." (PAR 867)  Internal BLM
15  concerns and comments were also addressed in the final EA. (PAR
16  520)

17       Based on the foregoing, the court concludes the BLM considered
18  all the relevant factors, including important mitigation measures,
19  took a "hard look" at the environmental impacts, and, therefore,
20  did not act arbitrarily, capriciously, or abuse its discretion when
21  it decided that the project's impacts on the environment would be
22  insignificant and an EIS was not required.  Accordingly, the court
23  finds that plaintiffs are not likely to succeed on the merits of
24  their claim that an EIS was required in this case.

25

26       B.  Irreparable Harm
27       Plaintiffs must show that irreparable injury is likely in the
28

absence of an injunction. *Winter,* 129 S. Ct. at 375.   For the
reasons set forth above, irreparable injury to the sage-grouse
population seems unlikely. The greater sage-grouse is a "candidate
species" for the endangered species list, but has not be
prioritized. (EA 58)  Indeed, in the fall of 2010, the Nevada
Department of Wildlife allowed hunting of sage-grouse throughout
most of Nevada, including Spring Valley.  (SVW Opp'n Harrison Decl.
¶ 4)   In addition, fragmentation of habitat does not pose a
substantial risk in this case.  The project area is not one with
high-quality sagebrush, suitable for sage-grouse habitats.  (EA 58,
165)  Existing roads and facilities already fragment the area. (EA
58)  None of the 38 sage-grouse leks in Spring Valley are in the
project area. (EA 59)  The closest lek is 1.5 miles from the site,
is separated from the project by State Highway 893, and averages
only three birds per year. *Id.*  Two other leks about 6000 feet from
the project's boundaries are inactive and are divided by U.S.
Highway 50/6, State Highway 893 and other dirt roads.  *Id.*
Telemetry data collected between 2008 and 2010 by the Southern
Nevada Water Authority recorded no birds in the project area.  *Id.*
Thus, temporary disturbance of sage-grouse habitat is predicted to
be only four percent of the total habitat and permanent disturbance
only one percent of the total habitat. (EA 105-106)  Finally, the
BLM has designed mitigation measures to reduce the impact on sage-
grouse including restricting project activities between March and
May and within two miles of an active lek, managing weed
infestation and soil resources, and funds for sagebrush enhancement
and restoration. (EA 160, 164-9; SVW Opp'n Inlow Decl. ¶ 3; EA app.

F, at 18)  Given the poor quality of sagebrush habitat within the project boundaries, the lack of sage-grouse use of the project area, the BLM's mitigation measures, and Spring Valley Wind's commitment to enhance existing habitat, it is unlikely the sage-grouse population will suffer irreparable harm if the court denies the plaintiffs' request for injunctive relief.

In addition, the initial stages of development of the project pose no threat to the bats.  Any risk to the bat population arises from operational wind turbines.  The wind turbines will not be operational until April 1, 2012. (SVW Opp'n Inlow Decl. ¶ 16) There is no risk of irreparable harm to the bats *before* a decision on the merits of this case is determined. *Winter*, 129 S. Ct. at 375.

Also, for the reasons set forth in detail above, the risks to the bats from operational wind turbines should be insignificant as well.  As the studies considered and conducted by the BLM indicate, the Rose Guano Cave is a seasonal migratory stop-over for a large population of free-tailed bats, but the bats only use the cave for a limited period of time. (EA 61)  Further, their foraging and migratory patterns tend to take them parallel to and away from the project site at high altitudes. *Id.*  These habits when combined with the extensive mitigation measures proposed by the BLM – including but not limited to, radar detection and monitoring to break and feather turbine activity, phased turbine curtailment and shutdowns, a $500,000 wildlife fund, and a TAC to regularly monitor project impacts so that the project will not exceed the reasonable bat mortality threshold  of 192 bats per year set forth in the EA –

1  it is unlikely the bats will suffer irreparable harm. (EA 96, 98;
2  EA app. F, at 15-31)

3       Accordingly, the court concludes that a denial of a
4  preliminary injunction at this stage in the proceedings will not
5  result in irreparable harm to either the sage-grouse or the free-
6  tailed bats.

7

8       C.  Balance of Equities

9       Delaying this project would harm federal renewable energy
10  goals.  The United States government has ordered developing
11  renewable, alternate energy sources to reduce the country's
12  dependance on foreign oil and address concerns over climate change.
13  (BLM Opp'n Ex. E (Interior Orders 3285, 3289))  The Energy Policy
14  Act of 2005 directs the Secretary of the Interior to approve
15  renewable energy projects.  Executive Order 13212 requires federal
16  agencies to expedite renewable energy projects. (BLM Opp'n Ex. G)

17       The project is beneficial to Nevada's economic recovery.  The
18  project will generate enough energy to power 49,000 Nevada homes.
19  (EA 5)  Its property taxes will create over $1.65 million in tax
20  revenue for the state. (EA 144)  It will create 225 construction
21  jobs, with employment preferences to Nevada residents and about $6
22  million in wages during the construction period.  (BLM's Opp'n
23  D'Aversa 2d Decl. ¶ 3; SVW Opp'n Hardie Decl. ¶ 16)  It will create
24  up to 12 permanent operation positions. *Id*. Wages over the life of
25  the project would be about $15 million. *Id*. On the condition that
26  the project is built, Spring Valley Wind has committed $750,000 in
27  economic benefits to White Pine County over the next 20 years. (SVW
28

28

1  Opp'n Hardie Decl. ¶ 16D)

2       The defendants assert that a preliminary injunction would
3  result in the loss of the project.  Spring Valley Wind will likely
4  lose federal funding through the ARRA if it does not begin
5  construction on the project by the end of September 2011. Id. ¶ 10.
6  It would also threaten the project's eligibility for an investment
7  tax credit grant. *Id.*  Without these financial incentives, it is
8  likely the project would not be built. *Id.*   In addition, an
9  injunction would hinder Spring Valley Wind's ability to honor its
10  contracts with Nevada Energy. *Id.* ¶11.  Under these contracts,
11  Spring Valley Wind must obtain construction financing by June 30,
12  2011. *Id.*   Finally, Spring Valley Wind has invested $11 million in
13  the project thus far. *Id.* ¶15.   It will commit an additional $12
14  million to ensure the project is operational by June 30, 2012. *Id.*
15  Spring Valley Wind faces a financial loss of $23 million if the
16  project is delayed. *Id.*

17       While the court recognizes that the denial of an injunction
18  will result in the commencement of construction on the project, for
19  the reasons set forth above, the court concludes that any
20  disturbance of the sage-grouse and bat habitats will be minimal and
21  will not significantly impact the environment as long as the
22  mitigation measures set forth in the EA are complied with.[15]

23
24       [15] In addition, the court, during the hearing on the plaintiffs'
25  application for the injunction, urged the BLM, upon appropriate
26  application by the plaintiffs, to consider the impact of the Texas
27  Gulf Wind study might have, if any, on the mitigation measures set
28  forth in the EA.

1  Therefore, the balance of equities tips in favor of the defendants.

2

3       D.  Public Interest

4       The public has a strong interest in the project.  Congress has

5  articulated the public policy that our nation should incorporate

6  clean energy as a necessary part of America's future and it is

7  essential to securing our nation's energy independence and

8  decreasing green house emissions.  (SVW Opp'n Hardie Decl. ¶¶ 9-10

9  (referencing ARRA of 2009 which amended Energy Policy Act of 2005))

10  It is also important to Nevada's economic and clean energy goals.

11  The state's unemployment rate is 14.9 percent. (BLM's Opp'n

12  D'Aversa 2d Decl. ¶ 3)  The project would generate over 220 new

13  jobs with priority to Nevada residents and over $20 million in

14  wages. (BLM's Opp'n D'Aversa 2d Decl. ¶ 3; SVW Opp'n Hardie Decl. ¶

15  16)  Additionally, it would provide millions of dollars in property

16  tax revenue. *Id.*  Nevada is also committed to developing renewable

17  energy sources. (SVW Opp'n, Ex. 3, Ex. C-1, Letter from Harry Reid

18  to Mary D'Aversa ("I write to voice my support for the ...

19  project[, which] ... represents an important milestone in

20  developing Nevada's .. Clean energy resources.")) *See also* N.R.S. §

21  701A.220.  The project, which has contracted with Nevada Energy

22  will certainly help the state reach these goals.

23       While the public also has a strong interest in preserving the

24  environment and protecting species like the free-tailed bats and

25  greater sage-grouse, as noted above, that interest in this case at

26  this stage in the proceedings is outweighed by the other interests

27  articulated in this decision.

28

30

**V.    Conclusion**

Having fully considered the administrative record and the arguments of the parties, and having weighed all relevant factors necessary for issuing a preliminary injunction – the likelihood of success on the merits, the likelihood of irreparable harm, the balance of equities, and the public interest – the court finds that the plaintiffs have failed to carry their burden of showing that a preliminary injunction should issue at this time.  Plaintiffs' motion for a temporary restraining order/preliminary injunction (Docket No. 24) is DENIED.

**IT IS SO ORDERED.**

DATED: This 28th day of March, 2011.

_Howard D McKibben_
UNITED STATES DISTRICT JUDGE