**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT and CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) | 3:11-cv-00053-HDM-VPC |
| Plaintiffs, | ) ) | |
| vs. | ) ) | ORDER |
| BUREAU OF LAND MANAGEMENT, | ) ) | |
| Defendant, and | ) ) | |
| SPRING VALLEY WIND LLC, | ) ) | |
| Defendant-Intervenor. | ) ) | |

Plaintiffs have filed a motion for injunction pending appeal under Federal Rule of Civil Procedure 62(c) and Federal Rule of Appellate Procedure 8(a)(1). (Docket No. 66-1) Defendants Bureau of Land Management (BLM) and Spring Valley Wind, LLC have opposed the motion. (Docket Nos. 73, 74) Plaintiffs have waived their reply brief. (Docket No. 77)

1

**I.   Standard of Review**

Pursuant to Fed. R. Civ. P. 62(c), the court may suspend, modify, restore, or grant an injunction while an appeal is pending. Fed. R. App. P. 8(a)(1) requires a motion to stay be filed in the district court before a party may seek relief from the Ninth Circuit. *Lands Council v. Packard*, 391 F. Supp. 2d 869, 870 (D. Idaho 2005).

It appears the Ninth Circuit currently recognizes two standards for injunctions pending appeal.  The more stringent standard requires analyzing: (1) whether plaintiffs established a strong likelihood of success on the merits; (2) whether the balance of irreparable harm favors plaintiffs; and (3) whether the public interest favors granting the injunction. *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 551 (9th Cir. 1977).  The less stringent standard employs a showing similar to that required for a preliminary injunction under Fed. R. Civ. P. 65. *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983). This standard requires plaintiffs demonstrate "either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiffs'] favor." *Sega Enterprises, Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1517 (9th Cir. 1989).[1]

---

[1] The Ninth Circuit reviews a district court's decision denying a request for a preliminary injunction for abuse of discretion. *Earth Island Inst. v. Carlton,* 626 F.3d 462, 468 (9th Cir. 2010).  "A district court abuses its discretion if in denying [such] a request ... it bases its decision on an erroneous legal standard or clearly erroneous findings of fact." *Id*.  Thus, the Ninth Circuit's review is "limited and deferential." *Id*.

**II. Discussion**

On March 28, 2011, this court entered orders denying plaintiffs' motion for a temporary restraining order and/or a preliminary injunction (Docket No. 24) and granting defendant Spring Valley Wind's motion to strike the extra-record declaration of Merlin D. Tuttle (Docket No. 50). (Docket Nos. 62, 61) The court held that plaintiffs had failed to show a likelihood of success on the merits, the possibility of irreparable harm, and that the balance of equities or public interest tipped in their favor. (Docket No. 62) The court also held that the Tuttle Declaration should be stricken from the record because it did not fall within any of the four exceptions under which the court may consider extra-record evidence. (Docket No. 61)

In bringing their motion for an injunction pending appeal (Docket No. 66-1), plaintiffs have not raised any new issues beyond those already presented to and adjudicated by this court on plaintiffs' application for injunctive relief (Docket No. 24). Because the court has already reviewed and rejected these arguments when it issued its order on the motion for a temporary restraining order and/or a preliminary injunction (Docket No. 62) and its order striking the Tuttle Declaration (Docket No. 61), it is unnecessary to revisit those same issues in depth. *See Lands Council*, 391 F. Supp. 2d at 871.

In reviewing its decision, the arguments of the parties, and the administrative record, the court finds and concludes as follows:

A. Success on the Merits

NEPA requires the preparation of an environmental impact statement (EIS) when an agency's actions will significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(c). If in preparing an environmental assessment, the agency determines that the action

will have no significant impact, an EIS is not required. 40 C.F.R. § 1508.9(a). A decision to forego an EIS may be justified by the adoption of mitigation measures to offset potential environmental impacts. *National Parks & Conservation Assoc. v. Babbitt*, 241 F.3d 722, 733-34 (9th Cir. 2001). If "significant measures are taken to 'mitigate the project's effects, they need not completely compensate for adverse environmental impacts.'" *Wetlands Action Network v. United States Army Corps of Eng'rs*, 22 F.3d 1105, 1121 (9th Cir. 2000).

### 1. Impacts on Sage Grouse and Bats

The sage grouse population will not be significantly impacted by project activities in this case. Present range fragmentation and low quality sage-brush within the project's boundaries already make the area unappealing habitat to local sage grouse. The closest lek is 1.5 miles from the project site, is separated from the site by State Highway 893, and averages only three birds per year. (EA 59) Telemetry data for the area also confirms that there is no sage grouse activity within the project's boundaries. *Id.* Further, the EA determined that construction would temporarily disturb only 3.8 percent of the total habitat and permanently disturb only 1.1 percent of the total habitat. (EA 105-106) Mitigation measures such as funds for sage-brush enhancement, anti-perching devices to ward off predators, and limiting project activities during sage grouse mating seasons and near active leks will significantly reduce any potential impact of the project on the sage grouse.

Nor will the Brazilian free-tailed bat population be significantly impacted by project activities. The project area is not a permanent roosting site for the bats. (EA 62) The closest bat cave

is the Rose Guano Cave located four miles east of the project site. (EA 61) That cave is only a seasonal migratory stop-over for the bats two months out of the year. *Id*. During their fall migration, the bats remain at the cave for only four days. *Id*. While at the cave, the bats' nightly foraging pattern takes them to high altitudes away from the project site. (EA 61-62)

In addition, the BLM undertook a comprehensive review of available scientific reports regarding the bats' vulnerability to wind turbine mortality through barotrauma or collision while compiling the EA. (PAR 96, 109, 1546, 1222, 1229, 1234, 1237-1239) The BLM also studied bat mortality rates from 11 wind energy facility studies that focused on facility and habitat sites similar to Spring Valley. (EA app. F, at 24) Based on the data presented and potential concerns raised in these studies, the BLM properly developed a detailed process for addressing potential impacts on bats. That process is set forth in detail in the EA, particularly in the Avian and Bat Protection Plan (ABPP). *Id*. at 14-31. It includes mitigation measures such as a Technical Advisory Committee of experts on-sight to monitor bat mortality levels, a radar detection system to monitor bat flight patterns and foraging habits, and turbine speed curtailments and shut downs to be utilized during periods of high bat movement in the area. Curtailment initially will be utilized during the "highest use periods of August 1 through September 31, from sunset to 4 hours after sunset." *Id.* at 17. The proposed adaptive management process governs the implementation of up to five turbine curtailment mitigation phases if the designated bat mortality threshold is met. *Id.* at 22-23. These phases contemplate up to 1,080 hours of cut-in speed curtailment and turbine shutdowns for up to 37,500 hours. *Id.* at 25. These measures

5

have been shown to reduce bat mortality by 53 to 87 percent. (EA 98) Thus, if these mitigation measures are implemented, the project's impacts on bats will not be significant. In addition, the predicted short-term disturbance during construction of vegetation in habitat that *may* provide foraging area to bats is 336.9 acres or 3.9 percent of the total available foraging area within the project boundaries. (EA 96) The long-term disturbance would include only 111.1 acres of habitat that *may* provide foraging area to bats and represents only 1.3 percent of the project area. *Id*.

The BLM's decision to forego issuing an EIS is justified by the adoption of significant mitigation measures to offset potential environmental impacts. *Babbitt*, 241 F.3d at 733-34. These measures are supported by analytical data referenced in the administrative record and they adequately buffer against any potential negative impacts. Mitigation measures need not "completely compensate for adverse environmental impacts." *Wetlands Action Network*, 222 F.3d at 1121. Further, NEPA specifically allows agencies to utilize adaptive management plans that, like the ABPP in this case, monitor the real environmental effects of a project and allow the BLM to adapt its mitigation measures in response to the trends observed. *See Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010); *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993). The BLM did not abuse its discretion or act arbitrarily or capriciously in preparing and relying on the EA.

*2. Tiering*

The BLM did not abuse its discretion in relying on the Wind PEIS. "Tiering, or avoiding detailed discussion by referring to another document containing the required discussion, is expressly permitted"

and encouraged under NEPA, so long as the tiered-to document has been subject to NEPA review. 40 C.F.R. § 1502.02. Any new issues that developed after the Wind PEIS was published were addressed in detail in the final EA. The EA specifically supplements the Wind PEIS with site specific data on bats and sage grouse. (EA 52-53, 58-63, 96-98, 101-102, 105-111, 151-153, 165, 167) The EA considered bat collision with turbines, barotrauma, bat flight patterns and height, the Fish and Wildlife Service's decision to list sage grouse as "warranted" for the endangered species list, and telemetry data concerning active and inactive leks in the project area. (EA 97, 108-109, 58-59) The BLM also considered the mitigation measures proposed by the Wind PEIS and implemented the ones most suited for the project site. (EA 160-173) An EA need not consider all mitigation measures proposed in a PEIS. Measures should be evaluated objectively and on a site specific basis before being implemented. (Wind PEIS 5-1) Tiering the EA to the Wind PEIS was proper.

### 3. Cumulative Impacts

The EA also considered the cumulative impacts of the project on wildlife resources. 40 C.F.R. § 1508.27(b)(7). The EA's discussion of cumulative impacts includes a detailed table that discusses past actions, present actions and future actions that may cumulatively impact the environment. (EA 148-151) These include other impacts to the environment such as ranching and grazing. *Id.* The EA also notes that adjustments may need to be made to maintain habitat quality of other species in the area, such as utilizing existing fencing and vegetation treatment. *Id.* The EA also identified five reasonably foreseeable actions that could contribute to cumulative impacts. (EA 151) They are: (1) the Southern Nevada Water Authority Groundwater

Development Project; (2) the NextEra Wind Energy Development; (3) the Ely Wind (Antelope Range) project; (4) the Wilson Creek Wind project; and (5) continued grazing in the area. *Id.* Although these projects and activities will incrementally increase the cumulative impacts of the Spring Valley Wind project, after careful consideration of all the factors, the BLM determined that when combined with the significant mitigation measures outlined in the ABPP, the result would be only a small percentage change in effects. *Id.* Moreover, the EA properly tiers to the Wind PEIS and notes that "direct, indirect and cumulative impacts" are "quantified where possible" in its individual "discussions of impacts on each affected source." (EA 148) Indeed, impacts on bats and sage-grouse are addressed in more detail in other sections of the EA. (EA 81-122, 96-98, 101-102, 108-110, app. F) By considering other foreseeable actions in the region, tiering to the Wind PEIS, incorporating new scientific data into its final decision, and articulating substantial mitigation measures, the BLM sufficiently considered the cumulative impacts of the project. Under these circumstances it is proper to defer to the BLM's expert conclusion.

    *4. Tuttle Declaration*

Courts reviewing an agency decision are limited to the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). This means that "[j]udicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). The evidence presented in the Tuttle Declaration attacks the adequacy of the BLM's review of bat mortality risks related to wind energy facilities and the

sufficiency of its mitigation measures. The Tuttle Declaration relies heavily on data from a Texas Gulf Wind Facility study. The data from that study was finalized in January 2011 and was not before the BLM when it issued its decision in this case in October 2010. Thus, to be considered by the court, the Tuttle Declaration must fall into at least one of four limited exceptions that permit a court to consider extra-record evidence: (1) when an agency has failed to consider all relevant factors, (2) when an agency has relied on documents not in the record, (3) when the evidence is required to explain highly technical subject matter, or (4) when an agency has acted in bad faith. *Id*.

Plaintiffs contend the court should have considered the Tuttle Declaration under two of the four exceptions – (1) the consideration of relevant factors and (2) the explanation of technical subject matter. However, the declaration does not fall into either of these exceptions. *Id.* First, the admission of extra-record evidence is not necessary to determine "whether the agency has considered all relevant factors and has explained its decision" in this case. *Id.* The administrative record indicates that the BLM reviewed 11 wind projects in the western U.S. with habitats similar to Spring Valley. (EA app. F, at 24) Based on the bat mortality rates determined in these studies, the BLM concluded that the bat mortality threshold for the Spring Valley Wind project would be 2.56 bats per turbine per year after taking into consideration the extensive mitigation measures to be implemented to ensure this threshold is not exceeded. *Id.* One of the studies considered is the Judith Gap study in Montana, which presents a bat mortality rate approximately five times higher than that proposed in this case and similar to that indicated in the Texas

Gulf Wind data. *Id*. The administrative record also includes three published bat studies that acknowledge bat vulnerability to wind turbine mortality, either through barotrauma or collision. See e.g. Baerwald, et al, "Barotrauma is a Significant Cause of Bat Fatalities at Wind Turbines," (published 1/1/2008); Arnett, et al, "Effectiveness of Changing Wind Turbine Cut-in Speed to Reduce Bat Fatalities at Wind Facilities," 2008 Annual Report (published 4/1/2009); Baerwald, et al, "A Large-Scale Mitigation Experiment to Reduce Bat Fatalities at Wind Energy Facilities," (published 2009). Thus, the BLM reviewed numerous wind energy and bat related studies similar to the Texas Gulf Wind study and considered many factors relating to the risk of bat mortality at the Spring Valley Wind Facility.

Second, the evidence in the Tuttle Declaration is not necessary to explain technical terms or complex subject matter. *Id.* The Tuttle Declaration does not consider any new issues or scientific evidence not already raised or addressed by the BLM and included in the administrative record and admissible exhibits already presented by the parties in this case.

The Tuttle Declaration was not offered to fill holes in the BLM's analysis or explain complex subject matter. It was offered as a critique of the BLM's decision and to dispute the merits of that decision. Parties may not use "post-decision information as a new rationalization either for sustaining or attacking the Agency's decision." *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811-12 (9th Cir. 1980). It was not necessary for the BLM to consider the Tuttle Declaration before making its finding of no significant impact. Any questions raised regarding bat mortality levels at the project site were considered in depth by the BLM when it reviewed 11 bat mortality

studies at wind energy facilities similar to the project site at issue in this case. In addition, the BLM went to great lengths to tailor mitigation measures to the project to reduce impacts on bats. Accordingly, the plaintiffs have failed to show that the court abused its discretion in striking the Tuttle Declaration.[2] *Lands Council*, 391 F. Supp. 2d at 870-871; *Karuk Tribe of California v. U.S. Forest Service*, 2011 WL 1312564 (9th Cir. April 7, 2011). Even if the court had admitted the Tuttle Declaration, the court would have concluded that such evidence was insufficient to warrant the issuance of a preliminary injunction. Plaintiffs have failed to meet their burden of demonstrating success on the merits.

### B. Irreparable Harm

For the reasons set forth above, irreparable injury to the sage grouse population seems unlikely. Habitat fragmentation does not pose a substantial risk in this case and there are no active leks within the project area. Indeed, new telemetry data collected immediately prior to beginning construction on this project showed that there was no sage grouse activity in the two leks closest to the project site. (D'Aversa 3d Decl. ¶ 6) The closest distance to the project at which a sage grouse was observed was 5 miles. *Id.* In addition, although the greater sage grouse is a "candidate species" for the endangered species list, it has not been prioritized. (EA 58) In the fall of

---

[2] The court would note that this declaration was filed by the plaintiffs without first attempting to receive leave of court to do so. Nor did the plaintiffs request that the BLM re-open the administrative proceedings to consider this extra-record Tuttle Declaration discussing the new Texas Wind Facility data prior to filing it with the court.

11

2010, the Nevada Department of Wildlife allowed hunting of sage grouse throughout most of Nevada, including Spring Valley. (Harrison Decl. ¶ 4)  Given the poor quality of sagebrush habitat within the project boundaries, the lack of sage grouse use of the project area, the BLM's mitigation measures, and Spring Valley Wind's commitment to enhance existing habitat, it is unlikely the sage grouse population will suffer irreparable harm if the injunction is denied.

In addition, the initial stages of development of the project pose no threat to the bats.  Any risk to the bat population arises from operational wind turbines.  The wind turbines will not be operational until at least April 1, 2012. (Inlow Decl. ¶ 16)  There is no risk of irreparable harm to the bats before a decision on the merits of this case is determined.  Even once the wind turbines are operational, the data and mitigation measures presented by the BLM in the EA indicate that the bat population will not face irreparable or significant harm.  Notably, the free-tailed bat is one of the most abundant bat populations in the United States and over one million bats stop-over in the Great Basin area each year. (EA 52) "To equate the death of a small percentage of a reasonably abundant ... species with irreparable injury ... is to ignore the plain meaning of the word." *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975).

Finally, plaintiffs have not demonstrated that allowing the project to proceed at this stage would hinder, in any way, the court's ability to prevent irreparable injury at the point it becomes imminent. Bureaucratic momentum does not create immediate, irreparable injury.  Future injury or conjectural hypothetical injury months from now cannot form the basis of an injunction at this stage.  *See*

*Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984); *Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*, 2001 U.S. App. LEXIS 3683, *29 (9th Cir. Feb. 25, 2011).

### C. Balance of Hardships and Interests

The environmental interests are outweighed by other interests in this case. Delaying this project would harm federal renewable energy goals and delay Nevada's economic recovery. As the plaintiffs concede, Congress and the President have clearly articulated that clean energy is a necessary part of America's future and it is important to Nevada's economic and clean energy goals. In this case, this was a very important factor to consider, particularly in light of the time constraints on the availability of federal funding, in deciding whether to issue an injunction. The project would power over 40,000 Nevada homes, provide millions of dollars in property tax revenue, and generate over 220 new jobs with priority to Nevada residents and over $20 million in wages. (D'Aversa 2d Decl. ¶ 3; Hardie Decl. ¶ 16) An injunction would likely prevent Spring Valley Wind from obtaining federal funding and tax credits. *Id*. ¶ 10. Without these financial incentives, it is likely the project would not be built. *Id.* If the project is not built, Nevada will not be able to take advantage of the much needed economic and renewable energy benefits the project will bring to this state. With a state unemployment rate of 14.9 percent, compelling evidence has been presented that Nevada cannot afford to lose these benefits. (D'Aversa 2d Decl. ¶ 3)

In contrast, for the reasons set forth above, any disturbance of the sage-grouse and bat habitats will be minimal and will not significantly impact the environment. While the public also has a

13

strong interest in preserving the environment and protecting species like the free-tailed bats and greater sage-grouse, that interest in this case, at this stage in the proceedings, is outweighed by the other public interests articulated above.

As a final note, it is important to consider that the Spring Valley Wind Project is a tiered renewable energy development. The activities presently being litigated concern only the first phase of the development -- that is, one wind farm with only 60 to 70 wind turbines, not the 1,000 turbines plaintiffs claim will be built. Before expanding this renewable energy development the BLM would, under NEPA, be required to conduct a new, supplemental environmental assessment before approving construction. 43 C.F.R. §§ 1610, 2807.20; 43 U.S.C. § 1761; http://www.blm.gov/ca/st/en/info/nepa/ibca9874.html.[3] Thus, if the scope of the project is altered, a re-evaluation of the BLM's decision is required. *Id*. At that time, the BLM will have site-specific information relating to the mitigation measures that will be of critical importance in making an assessment as to whether a new or supplemental EA or an EIS will be required before the scope of the project is altered.

---

[3] Additional NEPA analysis, that is, a new or supplemental EA or EIS, is required when: (1) the proposed action has not been addressed previously, is in a new location, or involves a significant modification to an existing action; (2) the proposed action has been considered in a programmatic EIS or EA but a site-specific analysis is needed; or (3) there is significant new information, a major new issue, or a substantial change in circumstances relating to potential environmental effects of the proposed action.

### III. Conclusion

The court holds that plaintiffs have failed to demonstrate a likelihood of success on the merits, applying either the *Lopez* standard or the *Warm Springs* standard. In addition, plaintiffs have failed to show that the environment will be adversely affected or will suffer irreparable harm if an injunction is not issued, or that serious questions going to the merits were raised such that the balance of hardships and interests tips in their favor. Finally, plaintiffs have failed to establish that the court's decision to strike the Tuttle Declaration was an abuse of the court's discretion. Accordingly, the plaintiffs' motion for an injunction pending appeal (Docket No. 66-1) is DENIED.

**IT IS SO ORDERED.**

DATED: This 28th day of April, 2011.

_____
UNITED STATES DISTRICT JUDGE