UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT and CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) | 3:11-cv-00053-HDM-VPC |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | ORDER |
| BUREAU OF LAND MANAGEMENT, | ) ) | |
| Defendant, and | ) ) | |
| SPRING VALLEY WIND LLC, | ) ) | |
| Defendant-Intervenor. | ) ) | |

This action is an appeal from the Bureau of Land Management's administrative decision approving construction of a wind energy facility in Spring Valley, Nevada. On July 26, 2011, defendant BLM lodged the Administrative Record, which includes 1,139 non-privileged documents. (Docket No. 92)  On September 30, 2011, plaintiffs Western Watersheds Project and Center for Biological Diversity moved to supplement the administrative record with the Power Purchase Agreement (PPA), Texas Wind Data, and two declarations (Docket Nos. 30, 58) by Dr. Tuttle. (Docket No. 95)

1

On October 4, 2011, the BLM filed a Notice of Lodging of the Amended Administrative Record. (Docket No. 96)  The Amended Administrative Record includes 1,227 non-privileged documents, but not those plaintiffs seek to have the court review.  The BLM and intervening defendant Spring Valley Wind (SVW) opposed plaintiffs' motion to supplement the record on October 17, 2011. (Docket Nos. 99, 97 respectively).  Plaintiffs replied on October 27, 2011. (Docket No. 100)

I.   **Legal Standard**

The general rule is that courts reviewing an agency decision are limited to the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).  That is "the administrative record in existence at the time of the [agency] decision and [not some new] record that is made initially in the reviewing court." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (quoting *Southwest Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).).  The administrative record "consists of all documents and materials directly or indirectly considered by agency decisionmakers and includes evidence contrary to the agency's position." *Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 33 (N.D. Tex. 1981); *Nat'l Wildlife Fed'n v. Burford*, 677 F. Supp. 1445, 1457 (D. Mont. 1985); *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).

Documents and materials indirectly considered by agency decision-makers are those that may not have literally passed before the eyes of the decision-makers, but were "so heavily relied on in the recommendation that the decision maker constructively

considered" them. *Ctr. for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1275-76 (D. Co. 2010). For example, "[i]f the agency decision maker based his decision on the work and recommendations of subordinates, those materials should be included in the record." *Id.* In addition, if a certain study cited in a subordinate's recommendation is shown by clear evidence to have been heavily relied upon in the agency's final decision, then the study should be included in the administrative record even if the final decision-makers did not actually read the study. *Id*. The touchstone is the decision-makers' actual consideration. *Id*. at 1276. However, merely arguing "consideration through citation"[1] will not suffice because that "argument stretches the chain of indirect causation to its breaking point" and it fails to give appropriate deference to the agency's designation of the record. *Id*. at 1277; *Wildearth Guardians v. U.S. Forest Service,* 713 F. Supp. 2d 1243, 1255 (D. Co. 2010); *Wildearth Guardians v. Salazar*, 2009 WL 4270039, *4 (D. Ariz. Nov. 25, 2009).

There are four exceptions to this general rule excluding extra-record evidence. Extra-record evidence may be admitted if: (1) admission is necessary to determine "whether the agency has considered all relevant factors and has explained its decision," (2) "the agency has relied on documents not in the record," (3) "supplementing the record is necessary to explain technical terms

---

[1] "Consideration through citation" is when a document considered by the agency decision-makers contains references to other documents and it is argued that the cited documents should be included in the record because they were "indirectly" considered by the agency.

3

or complex subject matter," or (4) "plaintiffs make a showing of agency bad faith." *Lands Council*, 395 F.3d at 1030 (quoting *Southwest Ctr.*, 100 F.3d at 1450 (internal citation and quotation marks omitted).).

These exceptions should be narrowly construed and applied because there is a strong "presumption of regularity" toward the agency designated record. *Ctr. for Native Ecosystems*, 711 F. Supp. 2d at 1274; *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973); *Lands Council*, 395 F.3d at 1030 ("Were the federal courts routinely or liberally to admit new evidence when reviewing agency decisions, it would be obvious that the federal courts would be proceeding, in effect, de novo rather than with the proper deference to agency processes, expertise, and decision-making."). The burden to rebut the presumption or regularity lies with the party seeking to supplement the record. That party "must show by clear evidence that the record fails to include documents or materials considered by the [agency] in reaching the challenged decision" and that the record as presented is insufficient to allow "substantial and meaningful [judicial] review." *Ctr. for Native Ecosystems,* 711 F. Supp. 2d at 1275; *Franklin Sav. Ass'n v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1138-39 (10th Cir. 1991).

**II.  Analysis**

    A.  Power Purchase Agreement

The PPA is a contract between SVW and NV Energy that predates the BLM's final decision. (Mot. to Supp. 4)  Plaintiffs argue the PPA should be included in the Administrative Record because the BLM considered the energy requirements stated in the PPA in "developing

4

the [Spring Valley Wind] Project's purpose and need statement and alternatives." (Reply 2) Defendants oppose including the PPA in the Administrative Record because, although it was aware of the agreement, it "ha[d] never seen the Agreement," and it did not rely on the agreement in analyzing the environmental impacts of the Project and reaching its final decision. (BLM Opp'n 6; SVW Opp'n 2-3) In addition, the BLM argues that the PPA is a confidential document that "likely incorporates pervasive trade secret information" and would need to be heavily redacted if added to the Administrative Record. (BLM Opp'n 8, fn. 3)

The Environmental Assessment (EA) contains several references to an additional purpose of the Project being the production of 149.1 MW as required under the PPA.[2] (Mot. to Supp. Ex. 1) Although the PPA may not have literally passed before the eyes of the agency decision-makers in this case, it was "relied on in the [agency's] recommendation" to such an extent that the court finds

---

[2] The EA on page 5 states: "As part of meeting the Nevada RPS, NV Energy has entered into a Power Purchase Agreement (PPA) with SVW to purchase 149.1 MW of wind energy produced from the SVWEF if it is constructed.  Therefore, an additional purpose of this project is to meet the need to fulfill the production of 149.1 MW as required under the PPA." (Mot. to Supp. Ex. 1)  Page 7 of the EA states: "Each alternative meets the purpose and need for the project and includes 75 WTGs in order to achieve the 149.1 MW required by the PPA with NV Energy." *Id*.  Page 11 states: "no matter which turbine is selected, no more than the maximum 149.1 MW agreed to under the PPA would be output into the system." *Id*.

5

the BLM "constructively considered" it in making its decision. *Ctr. for Native Ecosystems*, 711 F. Supp. 2d at 1275-76.  However, the court also agrees with the BLM that some portions of the PPA may contain confidential information.  Accordingly, the court will grant plaintiffs' motion to supplement the record with those portions of the PPA that support the information provided to the BLM regarding the Project's need to produce 149.1 MW of wind energy.  All other portions of the PPA shall be redacted.

### B.  Texas Wind Data

The Texas Wind Data comes from a bat and bird mortality study conducted at the Texas Gulf Wind Facility in Kenedy County, Texas. The study focused on the efficacy of DeTect, Inc.'s MERLIN radar monitoring system in reducing mortality rates at wind turbine sites. (Brandt-Erichsen Decl. (Docket No. 98) Ex. A)  The final report on this data was issued on January 1, 2011, after the BLM issued its final decision in this case. *Id.*  At the hearing on plaintiffs' motion for a preliminary injunction on March 24, 2011, the court advised plaintiffs to follow agency procedure and request that the BLM consider the Texas Wind Data as an additional mortality study. (See Mar. 28, 2011 Order 16, fn. 15)  The BLM has received plaintiffs' request, but has not issued a "final analysis on any impact from the Texas Wind Study on the Project." (BLM Opp'n 12, fn. 5)

Plaintiffs argue the Texas data should be included in the Administrative Record because the EA references the study. (Mot. to Supp. 6, Reply 4)  In support of this argument, plaintiffs cite to vague references to "radar systems" in the EA, and a general statement about the Texas Gulf Wind Facility in the Avian and Bat

Protection Plan. (See Mot. to Supp. Ex. 1, pp. 90, 97; Ex.2, p. 15) In opposition, the defendants argue the Texas data was not before the BLM during the decision-making process and the data is irrelevant to the Spring Valley Wind Project. (BLM Opp'n 8-10; SVW Opp'n 3-7) Therefore, it was not considered by agency decision-makers in reaching the final decision. *Id.*

Plaintiffs must show by "clear evidence that the record fails to include documents or materials [directly or indirectly] considered by the [agency] in reaching the challenged decision" in order to rebut the presumption of regularity. *Ctr. for Native Ecosystems,* 711 F. Supp. 2d at 1275; *Franklin Sav. Ass'n*, 934 F.2d at 1138-39. Plaintiffs' have failed to meet this burden. A broad discussion of the effectiveness of radar systems that happens to include a general statement about the assumed effectiveness of the Texas Gulf Wind's radar system is not sufficient to prove the BLM directly or indirectly considered the Texas data in reaching its final decision. As with "consideration through citation," this argument stretches the chain of indirect causation too far and fails to give appropriate deference to the agency's designation of the record. *Ctr. for Native Ecosystems,* 711 F. Supp. 2d at 1277.

At the preliminary injunction hearing, the court advised plaintiffs to apply directly to the BLM and request that it consider the data. (Mar. 28, 2011 Order 16, fn. 15 ("[T]he court, during the hearing on the plaintiffs' application for the injunction, urged the BLM, upon appropriate application by the plaintiffs, to consider the impact ... the Texas Gulf Wind study might have, if any, on the mitigation measures set forth in the EA.")) It appears plaintiffs have complied and the BLM is in the

7

process of evaluating the potential impact of the data on the Spring Valley Wind Project. (BLM Opp'n 12, fn. 5)  Accordingly, the court will deny without prejudice plaintiffs' motion to supplement the record with the Texas Wind Data.

### C.  Tuttle Declarations

Plaintiffs argue the Tuttle Declarations (Docket Nos. 30, 58) should be included in the Administrative Record because they fit within an exception to the general rule on considering extra-record evidence.  Specifically, they argue the evidence in both declarations is necessary to determine "whether the agency has considered all relevant factors and has explained its decision" and the evidence in the first declaration "is appropriately considered because it concerns a topic for which 'the agency has relied on documents not in the record,'" to wit, the "characterization of the effectiveness of its Texas radar system." (Mot. to Supp. 11)  The defendants oppose supplementing the record with these declarations because they were not before the BLM when it made its decision, they do not fall within any of the exceptions to this rule, and their consideration would be contrary to the law of the case. (BLM Opp'n 10-15; SVW Opp'n 8-10)

The court finds the Tuttle Declarations should not be added to the Administrative Record because they contain extra-record evidence that was not before the BLM at the time it made its final decision, they do not fall within the four exceptions, and the court previously struck the first Tuttle Declaration (Docket No. 30) from the record. *Exxon Corp.*, 91 F.R.D. at 33.

On March 28, 2011, this court granted defendant SVW's Motion

to Strike the first Tuttle Declaration[3] (Docket No. 50), finding that the first Tuttle declaration was an eleventh hour submission that did not fall within any of the four exceptions that would permit consideration of extra-record evidence in this case. (Order on Mot. to Strike (Docket No. 61))  Therefore, it is the law of the case that the first Tuttle Declaration is not before the court and should not be added to the Administrative Record. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) ("the doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case").  The court may "depart from a prior holding [only] if [it is] convinced that it is clearly erroneous and would work a manifest injustice." *Arizona v. California,* 460 U.S. 605, 618 (1983).

There is no basis for the court to reconsider its order striking the first Tuttle Declaration.  First, the first Tuttle

---

[3]  The motion was titled "Motion to Strike Extra-Record Declaration, or in the Alternative, to Supplement the Record."  It is referred to in this order as the "Motion to Strike the first Tuttle Declaration" for clarity as to which document SVW sought to strike. SVW submitted a rebuttal declaration of Wallace Erickson (Docket No. 50-1) in support of its motion to strike, in the event the court chose not to strike the first Tuttle Declaration and, instead, chose to supplement the record.  Plaintiffs submitted the second Tuttle Declaration (Docket No. 58) to rebut the Erickson Declaration. Because the court struck the first Tuttle Declaration, it did not consider the Erickson Declaration or the second Tuttle Declaration.

9

Declaration has not been amended or modified to add new data or conclusions that would warrant the court reconsidering its earlier decision striking the declaration. For reasons already set forth in the court's March 28, 2011 order on the motion to strike (Docket No. 61), this unchanged evidence does not demonstrate that the BLM failed to consider all relevant factors in its decision.

Second, the court's holding that the BLM had not relied on documents outside the record in reaching its decision that would warrant admission of the first Tuttle Declaration is not "clearly erroneous and would [not] work a manifest injustice." *Arizona,* 460 U.S. at 618. A vague characterization of the effectiveness of the Texas Gulf Wind radar system in the Avian and Bat Protection Plan's (ABPP) discussion of radar monitoring is not enough to convince the court that its earlier decision was clearly erroneous. The reference to the Texas radar system in the EA was by example. (See Mot. to Supp. Ex.2, pp. 15) Moreover, the Texas data was not complete or fully available to the BLM when it made its final decision. Lastly, the BLM considered extensively other bat-related studies in drafting and designing the Avian and Bat Protection Plan, including some with adverse statistical data, such as the Judith Gap Study. (EA, App. F, ABPP 24; Not. of Am. Admin. R. Ex. 2) Therefore, disallowing the admission of Dr. Tuttle's opinion of the Texas radar system's effectiveness would not work a manifest injustice.

The second Tuttle Declaration (Docket No.58) was filed to rebut the Declaration of Wallace Erickson (Docket No. 50-1), which was submitted by SVW with its Motion to Strike the first Tuttle Declaration (Docket No. 50) to rebut the first Tuttle Declaration.

10

The Erickson Declaration was never considered by the court because the court elected to strike the first Tuttle Declaration. Consequently, consideration of the second Tuttle Declaration, the sole purpose of which was to rebut the Erickson Declaration, is a moot issue.

In addition, the evidence contained in the second Tuttle Declaration, which includes Dr. Tuttle's opinions on the population status of free-tailed bats and the adequacy of the ABPP, does not fall within any of the four exceptions that would permit the court to consider extra-record evidence. As with the first Tuttle declaration, the admission of this extra-record evidence is not necessary to determine "whether the agency has considered all relevant factors and has explained its decision" in this case. *Lands Council*, 395 F.3d at 1030  The administrative record indicates that the BLM reviewed data concerning the bat population and the impact the Spring Valley Wind Project could have on local bat populations. Specifically, the BLM considered 11 wind projects in the western United States with habitats similar to Spring Valley and three published bat studies on bat mortality risks. The full Administrative Record contains additional studies. The court will defer to the agency's expertise in evaluating this data. *Lands Council*, 395 F.3d at 1030. Second, it is clear from the record before the court that the BLM has not relied on documents not in the record, to wit, the Erickson Declaration, in reaching its decision in this case that would warrant supplementing the record with the second Tuttle Declaration. *Lands Council*, 395 F.3d at 1030. The Erickson Declaration was submitted by SVW for the sole purpose of rebutting the first Tuttle Declaration. There is no

evidence that indicates the Erickson Declaration was considered by the BLM in reaching its final decision. Consequently, there is no need for the agency to have considered the second Tuttle Declaration. Third, the evidence in the second Tuttle Declaration is not necessary to explain technical terms or complex subject matter. It is not being offered to explain Erickson's statistical analysis of the bat population. Instead, it is being offered to rebut his conclusions. It represents a difference in expert opinion. This is not enough to warrant its addition to the Administrative Record. *See Airport Cmtys Coal v. Graves*, 280 F. Supp. 2d 1207, 1213 (W.D. Wash. 2003) (varying expert opinions do not warrant improper de novo review by court of agency decision). Finally, there has been no showing of agency bad faith.

For the foregoing reasons, the court will deny plaintiffs' motion to supplement the record with the Tuttle Declarations.

### III. Conclusion

Plaintiffs' Motion to Supplement the Administrative Record (Docket No. 95) is GRANTED in part and DENIED in part. It is hereby ordered that:

1. Plaintiffs' request to supplement the Administrative Record with the Power Purchase Agreement is GRANTED in part. Defendants shall supplement the record with a redacted version of the Power Purchase Agreement containing the portions of the PPA that support the information provided to the BLM regarding the project's need to produce 149.1 MW of wind energy. Such supplementation shall be made within thirty (30) days.

2. Plaintiffs' request to supplement the Administrative Record with the Texas Wind Data is DENIED without prejudice. Plaintiffs may renew their motion to supplement the record with the Texas Wind Data after the BLM has had an opportunity to issue a final analysis of the impact of the Texas data on the Spring Valley Wind Project.

3. Plaintiffs's request to supplement the Administrative Record with the Tuttle Declarations (Docket Nos. 30, 58) is DENIED.

**IT IS SO ORDERED.**

DATED: This 4th day of January, 2012.

_____
UNITED STATES DISTRICT JUDGE